

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED
*September 19, 2024*
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § | |
| v. | § § | Criminal No. __4:24-cr-499__ |
| **ANDRE ORLANDO REID** | § § § § | **UNDER SEAL** |
| Defendant. | § | |

## INFORMATION

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise specified:

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

2. The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers, distributors, and dispensers, including pharmacies, of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or dispensers registering with the DEA were referred to as "registrants."

3.      The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

4.      It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." 21 U.S.C. § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

5.      An appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

6.      The Texas Administrative Code required that a "pharmacist shall make every reasonable effort to prevent inappropriate dispensing due to fraudulent, forged, invalid, or medically inappropriate prescriptions in violation of a pharmacist's corresponding responsibility." 22 Tex. Admin. Code § 291.29.

7. Oxycodone was an opioid classified as a Schedule II controlled substance. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The street value of oxycodone's 30 mg pills was approximately $1 per milligram.

## **Diversion of Oxycodone onto the Houston Area's Black Market**

8. One way that oxycodone 30 mg was "diverted"—funneled onto the Houston area's black market—was through pill-mill pharmacies, which typically serviced only customers seeking to pay cash to acquire the drug for non-medical purposes. These pharmacies deployed different schemes designed to provide them access to some of the black-market profit generated by oxycodone 30 mg, while also helping the pharmacies to evade detection by law enforcement. The "traditional" pill mill required individuals posing as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them.

9. Typical Houston area pill-mill pharmacies exhibited numerous "red flags" of diversion well-known throughout the pharmaceutical industry, which were also enumerated by the Texas State Board of Pharmacy ("TSBP") in *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF….*, which TSBP regularly distributed to licensed pharmacies. These red flags included:

   a. filling a reasonably discernible <u>pattern of substantially identical prescriptions</u> for the same controlled substances or combinations of controlled substances;

b. routinely filling prescriptions for known drugs of abuse, alone or in combination, including opioids, benzodiazepines (like alprazolam), and muscle relaxants;

c. routinely filling prescriptions for the highest strength and/or for large quantities of these drugs;

d. charging above-market rates and accepting mostly/only cash or credit (instead of insurance) for known drugs of abuse; and

e. routinely ordering controlled substances from more than one drug supplier.

## DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

10. Sheldon Dounn resided in Plantation, Florida. From there, Dounn facilitated the sale of oxycodone 30 mg and other drugs to pill-mill pharmacies in the Houston area. Dounn primarily sourced oxycodone from Wholesale Rx d/b/a Tyler Pharmaceuticals ("Wholesale Rx"), a Tennessee corporation.

11. Through Dounn, **ANDRE ORLANDO REID**—using the pseudonym "James"—ordered oxycodone 30 mg from Wholesale Rx for two Houston area pill mills: Prucare and HMR. **ANDRE ORLANDO REID** was willing to pay Wholesale Rx's over-market prices on oxycodone 30 mg, and to purchase non-controlled substances, such as ibuprofen 800 mg, that the pharmacies did not need or want, because Prucare and HMR could still sell the drugs for hundreds or even thousands of dollars, in cash, per bottle.

12. To obtain oxycodone 30 mg from Dounn and Wholesale Rx, **ANDRE ORLANDO REID** complied with certain requirements, conveyed to him by Dounn, that **ANDRE ORLANDO REID** understood were designed to provide Wholesale Rx with paper cover in the event of scrutiny. These included causing to be submitted, on behalf of Prucare and HMR, applications to purchase that contained details that Dounn knew were

4

false; and causing the pharmacies to abide by Wholesale Rx and Dounn's "caps" (limiting the number of oxycodone 30 mg pills that HMR and Prucare could purchase per month) and "ratios" (requiring HMR and Prucare to purchase a set number of pills for non-controlled substances for every oxycodone 30 mg pill—even though they were not needed or wanted, to meet Wholesale Rx's ratio requirement).

## COUNT ONE
### Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances
### (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))

13.     The General Allegations section of this Information is re-alleged and incorporated by reference as if fully set forth herein.

14.     From in or around January 2019, and continuing through on or about August 28, 2019, in the Southern District of Texas, and elsewhere, the defendant,

**ANDRE ORLANDO REID,**

did knowingly and intentionally combine, conspire, confederate, and agree with Sheldon Dounn and others, known and unknown to the United States Attorney, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **ANDRE ORLANDO REID**, Sheldon Dounn, and their coconspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

15.     The controlled substances involved in this conspiracy attributable to the defendant are mixtures and substances containing detectable amounts of oxycodone, a

Schedule II controlled substance, as well as other controlled substances, in violation of Title 21, United States Code, Section 841(b)(1)(C).

## Purpose of the Conspiracy

16. It was the purpose and object of the conspiracy for the defendant, **ANDRE ORLANDO REID**, Sheldon Dounn, and others, known and unknown to the United States Attorney, to unlawfully enrich themselves by, among other things: Distributing and causing to be distributed to HMR and Prucare, from Wholesale Rx, oxycodone and other controlled substances, in a manner not authorized by law, including by knowing and intending that the pharmacies would and did distribute and dispense the drugs without valid prescriptions—i.e., without prescriptions issued in the usual course of a professional practice for a legitimate medical purpose.

## Manner and Means of the Conspiracy

The manner and means by which the defendant, **ANDRE ORLANDO REID**, Sheldon Dounn, and their coconspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

17. Beginning in or around January 2019, and continuing through on or about August 28, 2019, the defendant, **ANDRE ORLANDO REID**, Sheldon Dounn, and others, known and unknown to the United States Attorney, distributed approximately 19,000 oxycodone 30 mg pills to HMR and Prucare, knowing and intending that HMR and Prucare would and did distribute and dispense the controlled substances without a legitimate medical purpose and outside the usual course of professional practice.

All in violation of Title 21, United States Code, Section 846.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

18. The allegation contained in Count 1 of this Information is hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

19. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, the defendant,

**ANDRE ORLANDO REID,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, and intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

20. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   d. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

This the 18th day of September, 2024.

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*/s/ Drew Pennebaker*
BY: DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE